1
2
3
4
5
6 **UNITED STATES DISTRICT COURT**

7 **CENTRAL DISTRICT OF CALIFORNIA**

8

9 VIVIAN SCHWARTZ, et al.,              )    Case No. SA CV 19-0559 FMO (ADSx)
                                        )
10                    Plaintiffs,       )
                                        )
11        v.                            )    **ORDER RE: PENDING MOTION**
                                        )
12 KEMPER INDEPENDENCE                  )
   INSURANCE COMPANY, et al.,           )
13                                      )
                     Defendants.        )
14 _____  )

15        Having reviewed and considered all the briefing filed with respect to the parties' cross-

16 motions for summary judgment (Dkt. 30, Motion for Summary Judgment ("Motion"), the court

17 concludes that oral argument is not necessary to resolve the Motion. See Fed. R. Civ. P. 78(b);

18 Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

19                                    **INTRODUCTION**

20        On March 22, 2019, Vivian Schwartz and Lawrence Schwartz (collectively, "plaintiffs")

21 initiated this action against defendants Kemper Independence Insurance Company ("Kemper") and

22 Kemper Corporation (collectively, "defendants"), asserting claims for: (1) declaratory relief; (2)

23 breach of contract; (3) tortious breach of contract; and (4) violation of Business and Professions

24 Code §§ 17200, et seq.  (See Dkt. 1, Complaint at ¶¶ 31-56).  On April 16, 2019, the parties

25 stipulated to the dismissal of Kemper Corporation, as well as the dismissal of plaintiffs' claim for

26 violation of Business and Professions Code §§ 17200, et seq. (See Dkt. 16, Stipulation to Dismiss

27 Defendant Kemper Corporation [ ] and to Dismiss Claim [ ]).  The court granted this stipulation on

28 April 17, 2019. (See Dkt. 17, Court's Order of April 17, 2019).

1      Plaintiffs and Kemper, the only remaining defendant, thereafter filed cross-motions for

2  summary judgment.  (See Dkt. 30, Motion).  Kemper claims that it does not have a duty to defend

3  plaintiffs, who purchased an insurance policy ("the Policy") from Kemper, because: (1) plaintiffs'

4  failure to disclose defects in their property is not an "occurrence" under the Policy; (2) the Policy's

5  "owned property" exclusion bars coverage for a third-party liability claim for property damage to

6  plaintiffs' insured property; and (3) plaintiffs' failure to disclose defects in the insured property does

7  not cause "property damage" under the Policy's third-party liability coverage.  (See id. at 1).

8  Plaintiffs contend that the operative question is not whether any negligent misrepresentation

9  constitutes an "occurrence" or "property damage" under the terms of the Policy, but whether

10  plaintiffs' alleged negligence in failing to adequately repair the water intrusion at the insured

11  property constitutes an "occurrence" resulting in property damage.  (See id. at 2).

12               **STATEMENT OF FACTS**[1]

13  I.     PLAINTIFFS' INSURANCE POLICY.

14      On or about January 20, 2006, plaintiffs purchased the Policy from Kemper for their

15  residence located in San Clemente, California ("the Property").  (See Dkt. 30-1, Joint Stipulation

16  of Facts ("Stipulation") at ¶ 1).  The Policy provided coverage for personal liability as follows:

17          If a claim is made or a suit is brought against an 'insured' for damages

18          because of . . . 'property damage' caused by an 'occurrence' . . . to which this

19          coverage applies, [Kemper] will:

20          1. Pay up to [its] limit of liability for the damages for which the 'insured' is

21          legally liable.  Damages include prejudgment interest awarded against the

22          'insured'; and

23          2. Provide a defense at [its] expense by counsel of [its] choice, even if the

24          suit is groundless, false or fraudulent.  [Kemper] may investigate and settle

25          any claim or suit that [it] decide[s] is appropriate.  [Kemper's] duty to settle or

26

27

28    [1] "The parties agree that the essential facts are undisputed and that the cross-motions present issues of law."  (Dkt. 30, Motion at 1).

1        defend ends when the amount [it] pay[s] for damages resulting from the

2        'occurrence' equals [its] limit of liability.

3  (See Dkt. 30-3, Joint Evidentiary Appendix ("JEA"), Exh. 1, Insurance Policy at JA1_015).  The

4  Policy defines "occurrence" to mean "an accident, including continuous or repeated exposure to

5  substantially the same general harmful conditions, which results, during the policy period, in:  [(a)]

6  'Bodily injury'; or [(b)] 'Property damage.'" (Id. at JA1_001).  The Policy defines "property damage"

7  to mean "physical injury to, destruction of, or loss of use of tangible property."  (Id.).  Personal

8  liability coverage does not include "'property damage' to property owned by the 'insured'[,]" (id. at

9  JA1_0117), and is limited to "'bodily injury'  or 'property damage' . . . which occurs during the

10  policy period." (Id. at JA1_20).  The Policy expired on March 20, 2020. (See Dkt. 30-1, Stipulation

11  at ¶ 1).

12  II.    UNDERLYING ARBITRATION PROCEEDING.

13        In January 2012, plaintiffs entered into a contract to sell the Property to Jaemin Ragsdale

14  ("Ragsdale"), and escrow on the sale closed on March 13, 2012.  (See Dkt. 30-1, Stipulation at

15  ¶ 2).  Plaintiffs owned the Property for decades prior to selling it, and experienced periodic water

16  intrusion issues while living there.   (See Dkt. 30-3, JEA, Exh. 2, Arbitration Award at JA2_003).

17  Prior to listing the Property for sale, plaintiffs had undertaken three separate efforts to abate water

18  intrusion, in 2009, 2010, and 2011.  (See id. at JA2_003-05).

19        In approximately May 2012, during the first rain following the sale of the Property, the

20  Property experienced substantial water intrusion.  (See Dkt. 30-3, JEA, Exh. 2, Arbitration Award

21  at JA2_006). This issue persisted at the Property during subsequent rains.  (See id.).  Ragsdale

22  eventually retained contractors who, through destructive testing, discovered: (1) the source of the

23  water intrusion; and (2) substantial property damage in the form of mold, dry rot and other physical

24  deterioration of the structural and nonstructural aspects of the Property.  (See id. at JA2_008-12).

25        On or about December 10, 2013, Ragsdale submitted an arbitration demand pursuant to

26  the arbitration clause contained in the property purchase agreement.  (See Dkt. 30-3, JEA, Exh.

27  5, Email re: Judicate West Case Submission at JA5_001; Dkt. 30-1, Stipulation at ¶ 4).  Ragsdale

28  alleged that plaintiffs "failed to disclose that the rooftop deck was damaged and leaking into the

1   residence" at the time they sold the Property to him, and that plaintiffs "negligently represented

2   that the deck had recently undergone a full repair and replacement and was performing properly[.]"

3   (See Dkt. 30-1, Stipulation at ¶ 3) (emphasis omitted).

4       On January 28, 2019, the arbitrator issued an award in favor of Ragsdale.  (See Dkt. 30-3,

5   JEA, Exh. 2, Arbitration Award; Dkt. 30-1, Stipulation at ¶ 12).  The arbitrator found that plaintiffs

6   were liable for negligence, negligent nondisclosure, and breach of contract, and awarded

7   Ragsdale: "(1) $490,000 constituting the difference between the price paid for the subject property

8   and the value received for the subject property;" (2) "$130,500 as compensation for loss of use

9   of the subject property;" and (3) "$281,375 for attorney's fees and costs incurred in the successful

10  pursuit of this matter."  (See Dkt. 30-3, JEA, Exh. 2, Arbitration Award at JA2_022).

11      As to the negligence claim, the arbitrator found that plaintiffs acted negligently by: "(1)

12  failing to abate the water intrusion problem, which resulted in physical damage to the entire home

13  structure[;] (2) hiring unqualified  contractors who constructed and/or repaired the rooftop deck

14  without  the  required  permits[;]"  and  (3)  "allowing  for  the  deficient,  defective,  and

15  non-code-compliant work of the contractors as their agents, and for their own negligence in

16  performing inadequate repairs and improper maintenance."  (Dkt. 30-3, JEA, Exh. 2, Arbitration

17  Award at JA2_015).  The arbitrator also found that plaintiffs "were negligent in their failed attempts

18  to repair the source of the leaking by applying Henry's cement on the rooftop deck and elastomeric

19  coating to the home's exterior, which only exacerbated the water intrusion condition and caused

20  further damages to the subject property."  (Id. at JA2_018).

21  III.   KEMPER'S DENIAL OF COVERAGE.

22      On December 18, 2014, Kemper notified plaintiffs that Ragsdale had submitted a third-party

23  liability claim against the Policy.  (See Dkt. 30-3, JEA, Exh. 7, December 18, 2014, Letter from

24  Kemper to Plaintiffs; Dkt. 30-1, Stipulation at ¶ 6).  On February 11, 2015, Kemper sent a letter

25  to plaintiffs stating that it did not have a duty to defend or indemnify them in the arbitration

26  proceeding. (See Dkt. 30-3, JEA, Exh. 8, February 11, 2015, Letter from Kemper to Plaintiffs; Dkt.

27  30-1, Stipulation at ¶ 7).  According to Kemper, it was denying coverage because "there [wa]s no

28  'occurrence' being alleged [by Ragsdale] to trigger liability coverage as there is no accident being

4

alleged resulting in . . . 'property damage.'" (Dkt. 30-3, JEA, Exh. 8, February 11, 2015, Letter from Kemper to Plaintiffs at JA8_005).  Kemper also stated that "[i]f for[] some reason it could be construed that there were an 'occurrence', which there was not, . . . [a]ny liability claim for damage that occurred during [plaintiffs'] policy period would be excluded by the exclusion for 'property damage' to property owned by the insured." (Id. at JA8_005-006).

On December 5, 2018, plaintiffs emailed a request to Kemper to re-open its file and provide plaintiffs with a defense in the underlying arbitration.  (See Dkt. 30-3, JEA, Exh. 9, December 5, 2018, Email from Michael Dawe to Kemper; Dkt. 30-1, Stipulation at ¶ 8).  Plaintiffs notified Kemper that, in the underlying arbitration proceeding: (1) Ragsdale's construction expert testified that the alleged damage to the Property "in all likelihood occurred during the time[ ]frame covered by the [Policy]"; and (2) Ragsdale alleged that plaintiffs "failed to prevent [the] property damage during their ownership of the [P]roperty . . . and that [he] only discovered this [damage] when, in the process of the arbitration proceeding, he undertook destructive testing."  (See id.).

On December 7, 2018, Kemper re-opened its file to review its previous decision to deny plaintiffs coverage under the Policy.  (See Dkt. 30-3, Exh. 10, December 7, 2018, Email from Kemper to Michael Dawe; Dkt. 30-1, Stipulation at ¶ 11).  On February 20, 2019, after the arbitrator issued his decision, Kemper re-affirmed its previous decision to deny coverage for the claim asserted by Ragsdale.  (See Dkt. 30-3, Exh. 11, February 20, 2019, Letter from Kemper to Plaintiffs; Dkt. 30-1, Stipulation at ¶ 13).  In its letter to plaintiffs, Kemper stated that "[t]he [Policy] only provides coverage for an 'occurrence' (accident) resulting in . . . property damage.  The [P]olicy excludes coverage for . . . property damage which is expected or intended by an insured. To the extent that Plaintiff's allegations do not arise out of an accident resulting in . . . 'property damage', . . . Kemper disclaims indemnity and the duty to defend."  (See id. at JA11_008-09).

On or about July 10, 2019, plaintiffs' counsel sent the arbitration award order to Kemper, requesting that Kemper reconsider its coverage position.  (See Dkt. 30-3, Exh. 12, July 12, 2019, Email from Brian Cronin to Kemper; Dkt. 30-1, Stipulation at ¶ 15). On July 16, 2019, Kemper re-affirmed its denial, asserting, among other things, that it did not have a duty to defend plaintiffs because "[a]ny duty [plaintiffs] owed to the Ragsdales was based entirely upon the 2012

1  agreement to sell their house." (Dkt. 30-3, Exh. 14, July 16, 2019, Letter from Kemper to Michael

2  Dawe at JA14_001); (Dkt. 30-1, Stipulation at ¶ 16).

3       In responding to the plaintiffs' 2014 and 2018 tenders of claim, Kemper never investigated

4  plaintiffs' potential liability for property damage resulting from their alleged negligence.  Although

5  Kemper claimed in its February 11, 2015, letter to plaintiffs that it "completed its investigation of

6  the [ ] claim[,]" (see Dkt. 30-3, JA, Exh. 8 at JA8_001), Kemper never (1) attempted to interview

7  either Ragsdale or his experts; (2) sought to inspect the premises; (3) sought further information

8  or elaboration of Ragsdale's theories of damages; or (4) investigated the nature or timing of the

9  property damage. (See, generally, id. at Exh. 15).

10                                        **LEGAL STANDARD**

11       Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary

12  judgment "if the movant shows that there is no genuine dispute as to any material fact and the

13  movant is entitled to judgment as a matter of law."  The standard for granting a motion for

14  summary judgment is essentially the same as for granting a directed verdict.  Anderson v. Liberty

15  Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  Judgment must be entered "if,

16  under the governing law, there can be but one reasonable conclusion as to the verdict."  Id.

17       The moving party has the initial burden of identifying relevant portions of the record that

18  demonstrate the absence of a fact or facts necessary for one or more essential elements of each

19  cause of action upon which the moving party seeks judgment.  Celotex Corp. v. Catrett, 477 U.S.

20  317, 323, 106 S.Ct. 2548, 2553 (1986).  If the moving party fails to carry its initial burden of

21  production, "the nonmoving party has no obligation to produce anything."  Nissan Fire & Marine

22  Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  However, "[w]here the

23  non-moving party bears the burden of proof at trial, the moving party need only prove that there

24  is an absence of evidence to support the non-moving party's case."  In re Oracle Corp. Sec. Litig.,

25  627 F.3d 376, 387 (9th Cir. 2010); see Celotex, 477 U.S. at 325, 106 S.Ct. at 2554 (clarifying that

26  "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the

27  district court – that there is an absence of evidence to support the nonmoving party's case.").

28

If the moving party has sustained its burden, the burden then shifts to the nonmovant to identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested.  Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (A party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial.").[2]  A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth.  SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322, 106 S.Ct. at 2552; see also Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).

In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the nonmoving party.  Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206, 112 S.Ct. 2995 (1992).  However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (more than a "metaphysical doubt" is required to establish a genuine issue of material fact).  "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.  Moreover, it is not the court's task "to scour the record in search of a genuine issue of triable fact."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation marks omitted).  Rather, the nonmoving party must

---

[2]  "In determining any motion for summary judgment, the Court will assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Issues' and (b) controverted by declaration or other written evidence filed in opposition to the motion."  Local Rule 56-3.

1    "identify with reasonable particularity the evidence that precludes summary judgment." Id. (internal

2    quotation marks omitted).

3    **DISCUSSION**

4    I.    GENERAL LAW GOVERNING INSURANCE CONTRACTS.

5           Insurance policies "are contracts and, therefore, are governed in the first instance by the

6    rules of construction applicable to contracts." Montrose Chem. Corp. v. Admiral Ins. Co., 10

7    Cal.4th 645, 666 (1995).  "[T]he mutual intention of the parties at the time the contract is formed

8    governs its interpretation" and that "intent is to be inferred, if possible, solely from the written

9    provisions of the contract." Id.  In other words, "[i]f the meaning a layperson would ascribe to the

10   language of a contract of insurance is clear and unambiguous, a court will apply that meaning."

11   Id. at 666-67.

12          Insurance "coverage is interpreted broadly so as to afford the greatest possible protection

13   to the insured," while "exclusionary clauses are interpreted narrowly against the insurer."

14   MacKinnon v. Truck Ins. Exch., 31 Cal.4th 635, 648 (2003) (internal quotation marks omitted).

15   Insurers must "phrase exceptions and exclusions in clear and unmistakable language." Id.

16   (internal quotation marks omitted).  Ambiguities are resolved in favor of coverage. See AIU Ins.

17   Co. v. Superior Court, 51 Cal.3d 807, 822 (1990); Ticor Title Ins. Co. v. Employers Ins. of Wausau,

18   40 Cal.App.4th 1699, 1707 (1995) ("Our rules governing interpretation of contracts, including

19   insurance policies, teach us that the overriding goal of interpretation is to give effect to the parties'

20   mutual intentions as of the time of contracting.  Where contract language is clear and explicit and

21   does not lead to absurd results, we ascertain intent from the written terms and go no further.")

22   (internal citation omitted); Waller v. Truck Ins. Exch., 11 Cal.4th 1, 18-19 (1995) ("A policy

23   provision will be considered ambiguous when it is capable of two or more constructions, both of

24   which are reasonable. . . . Courts will not strain to create an ambiguity where none exists.")

25   (internal citations omitted).

26          With respect to liability insurance, an insurer has a duty to defend "[w]hen a suit against an

27   insured alleges a claim that 'potentially' or even 'possibly' could subject the insured to liability for

28   covered damages[.]" Reese v. Travelers Ins. Co., 129 F.3d 1056, 1060 (9th Cir. 1997)  (quoting

Vann v. Travelers Cos., 39 Cal.App.4th 1610, 1614 (1995)).  Thus, Kemper must establish the absence of any such potential or possibility.  See id.; Montrose Chemical Corp. v. Superior Court, 6 Cal.4th 287, 300 (1993) ("To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential*.  In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*.  Facts merely tending to show that the claim is not covered, or may not be covered, but are insufficient to eliminate the possibility that resultant damages (or the nature of the action) will fall within the scope of coverage, therefore add no weight to the scales.") (italics in original).

"In determining whether a duty to defend exists, courts look to all the facts available to the insurer at the time the insured tenders its claim for the defense."  Reese, 129 F.3d at 1060 (internal quotations and citation omitted).  "Where the policy provides no potential for coverage, the insurer is under no duty to defend in the underlying action."  Id. (citing Waller, 11 Cal.4th at 18).  Additionally, "[t]he insurer's duty to indemnify runs to claims that are actually covered, in light of the facts proved.  It arises only after liability is established."  Buss v. Superior Court, 16 Cal. 4th 35, 45 (1997).  Because the duty to defend is broader than, and separate from, the duty to indemnify, "where there is no possibility of coverage, there is no duty to defend."  Waller, 11 Cal.4th at 19 (internal quotation marks omitted).  In the absence of a duty to defend, no duty to indemnify exists.  Certain Underwriters at Lloyd's of London v. Superior Court, 24 Cal. 4th 945, 958 (2001).

II.   DUTY TO DEFEND.

It is axiomatic under California law that insurance policies cover tort liability, not contract liability.  See Home Indem. Co. v. Avol, 706 F.Supp. 728, 729-30 (C.D. Cal.1989).  Further, contractual agreements, including insurance policies, may not indemnify anyone from his or her own fraud, see Cal. Civ. Code § 1668, and California courts have defined fraud to include negligent misrepresentation.  See Blankenheim v. E.F. Hutton, 217 Cal.App.3d 1463, 1472 (1990) ("[C]ase law has long held that negligent misrepresentation is included within the definition of 'fraud.").  Here, plaintiffs do not argue that Kemper had a duty to defend the underlying action on

the basis of the breach of contract and negligent misrepresentation claims asserted by Ragsdale, (see, generally, Dkt. 30, Motion), but rather contend that Kemper had a duty to defend the negligence claim asserted by Ragsdale. (See id. at 1-2).

Kemper claims that it had no duty to defend the negligence claim because "Ragsdale's claims against plaintiffs arose out of . . . his purchase of the [Property] in reliance [on] plaintiffs' alleged failure to disclose [] defects. . . , [and] there was [thus] no 'occurrence' under the [P]olicy[.]" (Dkt. 30, Motion at 14). Kemper cites Safeco Insurance Co. of America v. Andrews, 915 F.2d 500 (9th Cir. 1990) to support its argument that it had no duty to defend plaintiffs in the underlying arbitration proceeding. (See id. at 12). In Safeco, the insured had a homeowner's policy which stated that the insurer would defend a suit brought against the insured "for damages because of bodily injury or property damage caused by an occurrence to which [the Policy] applies[.]" 915 F.2d at 501. Under the policy, "property damage" was defined as "physical injury to or destruction of tangible property, including loss of use of this property[,]" and "occurrence" was defined as "an accident, including exposure to conditions which results, during the policy period, in bodily injury or property damage." Id. at 502. After the insured sold the subject property, the third-party purchaser filed an action against the insured in state court, alleging four causes of action, including negligent failure to inspect the property and inform the third-party purchaser of certain alleged defects in the property, misrepresentation, breach of contract, and recision of contract. Id. at 501. The complaint was based on the insured's failure to inform the third-party purchaser of defects in the subject property, specifically an unstable foundation, defective electrical wiring, improper drainage, and water leakage in the basement. See id. The insured tendered his defense to the insurer, and the  insurance company then filed suit seeking declaratory relief from its duty to defend and to indemnify the insured in the state court lawsuit. Id.

The Ninth Circuit reversed the district court's denial of the insurer's motion for summary judgment, holding that the third-party purchaser's claims fell outside the scope of the policy because they "d[id] not expose [the insured] to liability for any damage to tangible property, but rather for economic loss resulting from [the insured's] alleged failure to discover and disclose facts relevant to the property's value and desirability." Safeco, 915 F.2d at 502. The court reasoned

that "[a]lthough the defective condition of the property [was] an element of [the third-party purchaser's] claims, the defects cannot, even when interpreting the policy broadly, be considered the cause of [third-party purchaser's] damages.  The cause of the damage was [the insured's] alleged misrepresentations, which are not an 'occurrence' . . . under the terms of the policy." Id. (emphasis omitted).

As discussed below, there is a serious question as to the viability of the Safeco decision. Assuming the Safeco decision is still viable in light of current California law, the case is readily distinguishable from the instant.  In Safeco, the insured brought a claim for negligent "fail[ure] to inspect and inform [the buyer] of defects in the property[.]" 915 F.2d at 502.  The Safeco insured's failure to inspect did not exacerbate the existing defects, and he was thus not exposed to liability for property damage.  See id.  Here, to the contrary, Ragsdale brought a claim for negligence based on: (1) plaintiffs' "fail[ure] to repair water intrusion problems, which resulted in physical damage to the entire residential structure, rooftop deck, walls, ceilings, framing and cavities that resulted in dry rot, deterioration of structural components and geo-organic growth"; (2) plaintiffs' conduct in "hir[ing] an unlicensed contractor who negligently constructed and/or repaired the rooftop deck without a permit and in violation of the applicable building codes"; and (3) the "deficient, defective, and non-code-compliant work of [plaintiffs] themselves in attempting to abate the problems." (Dkt. 30-3, JEA, Exh. 2, Arbitration Award at JA2_002).  While plaintiffs could not be exposed to liability for property damage where their conduct failed to remedy existing water intrusion damage, they could be exposed to liability for additional property damage caused by their negligence, i.e., the exacerbation of the water intrusion issue.[3]  See Hartford Fire Insurance Company v. Tempur–Sealy International, Inc., 158 F.Supp.3d 877, 887 (N.D. Cal. 2016) (finding Safeco and other "negligent misrepresentation cases cited by Plaintiff [ ] distinguishable [ ]

---

[3]  Kemper's argument that plaintiffs' conduct did not cause "property damage" as defined by the Policy, (see Dkt. 30, Motion at 38-40), is unavailing for the same reason.  While plaintiffs' attempt to repair existing damage may not have caused that damage, the attempt could have caused additional damage constituting "property damage" within the meaning of the Policy.

because they did not involve any alleged accidental conduct on the part of the insured in the causal series of events leading to the negligent misrepresentations").

Moreover, the court has doubts as to the viability of Safeco and case law cited by Kemper issued prior to the California Supreme Court's decision, issued nine years after Safeco, in Vandenberg v. Superior Court, 21 Cal.4th 815, 840 (1999).  In Vandenberg, the court held that "[t]he nature of the damage and the risk involved, in light of particular policy provisions, control coverage" and "reject[ed] the ex contractu/ex delicto distinction[.]"  21 Cal.4th at 839; see Anthem Elecs., Inc. v. Pac. Emp'rs Ins. Co., 302 F.3d 1049, 1056 (9th Cir. 2002) (finding that insurers' argument that negligence claim did not constitute an occurrence because it arose out of contract to supply goods sought to "revive a wooden distinction recently rejected by the California Supreme Court between contractual claims and insurance claims").  Safeco and its progeny appear to rely heavily on the ex contractu/ex delicto distinction rejected by Vandenberg.  See, e.g., Allstate Ins. Co. v. Hansten, 765 F.Supp. 614, 616 (N.D. Cal. 1991) ("Although [the negligence] claim does not refer to the [the insureds'] contractual duties, the alleged harm could not have been realized without the contract to sell the house."); Stanford Ranch, Inc. v. Maryland Cas. Co., 89 F.3d 618, 625 (9th Cir. 1996) ("The underlying lawsuits alleged claims based on breach of contract, negligent and intentional misrepresentation[.]  Liability for all of these claims depends upon the existence of the underlying purchase agreements because without the purchasing agreements, [the insured] would not have a duty of care towards the claimants.").  This distinction thus appears irrelevant; "[s]o long as [plaintiffs] can show that the[ir alleged negligence] caused covered property damage, it is well on its way to a prima facie case even though a breach of contract may be involved."  Anthem, 302 F.3d at 1056.

Here, the Policy provides liability coverage for claims brought against plaintiffs for "damages because of . . . 'property damage' caused by an 'occurrence'", and defines an "occurrence" as an accident.  (Dkt. 30-3, JEA, Exh. 1 at JA1_001, 015).  "Under California law, the word 'accident' in the coverage clause of a liability policy refers to the conduct of the insured for which liability is sought to be imposed on the insured."  Delgado v. Interinsurance Exchange of Automobile Club of Southern California, 47 Cal.4th 302, 311 (2009).  "An intentional act is not an 'accident' within

1    the plain meaning of the word." Royal Globe Ins. Co. v. Whitaker, 181 Cal.App.3d 532, 537 (1986)

2    (footnote omitted). "In the context of liability insurance, an accident is an unexpected, unforeseen,

3    or undesigned happening or consequence from either a known or an unknown cause." Delgado,

4    47 Cal.4th at 308 (internal quotation marks omitted).  The term "accident" refers to the nature of

5    the insured's conduct, and not to its unintended consequences.  See State Farm General Ins. Co.

6    v. Frake, 197 Cal.App.4th 568, 579 (2011).  An accident "is never present when the insured

7    performs a deliberate act unless some additional, unexpected, independent, and unforeseen

8    happening occurs that produces the damage."  Merced Mutual Ins. Co. v. Mendez, 213

9    Cal.App.3d 41, 50 (1989).  When an insured intends the acts resulting in the injury or damage, it

10   is not an accident "merely because the insured did not intend to cause injury.  The insured's

11   subjective intent is irrelevant."  Fire Ins. Exchange v. Superior Court (Bourguignon), 181

12   Cal.App.4th 388, 392 (2010) (citations omitted).

13          Nevertheless, coverage is not always precluded when the insured's intentional acts result

14   in injury or damage.   See Frake, 197 Cal.App.4th at 580.  An accident may exist "when any

15   aspect in the causal series of events leading to the injury or damage was unintended by the

16   insured and a matter of fortuity."  Merced, 213 Cal.App.3d at 50.  Here, viewing the record in the

17   light most favorable to plaintiffs for purposes of defendant's motion for summary judgment,

18   Kemper was informed that Ragsdale claimed damages for negligent conduct by plaintiffs separate

19   and distinct from Ragsdale's negligent misrepresentation claim.  (See Dkt. 30-3, JEA, Exh. 12 at

20   JA12_001); (id., Exh. 13 at JA13_001-02).  Moreover, Kemper would have been aware of

21   Ragsdale's allegations of plaintiffs' negligence had it conducted an adequate investigation in

22   response to plaintiffs' 2014 and 2018 tenders of claim.  Indeed, the court is particularly troubled

23   by Kemper's denial of its duty to defend plaintiffs in light of its failure to conduct an investigation

24   that, at a minimum:  (1) interviewed Ragsdale and his experts and reviewed and responded to the

25   experts' reports; (2) inspected the premises; (3) sought further information or elaboration of

26   Ragsdale's theories of damages; and (4) investigated the nature or timing of the property damage.

27          In any event, as discussed above, Ragsdale asserted that plaintiffs exacerbated prior

28   damage by "negligently fail[ing] to repair water intrusion issues and "attempting to abate the

                                          13

problems [themselves]." (Dkt. 30-3, JEA, Exh. 2, Arbitration Award at JA2_002).  That is, plaintiffs'
failure to properly fix the earlier damage (e.g.,water intrusion) caused further property damage
(e.g., more water intrusion).  Such a claim could possibly be covered by the Policy, as the alleged
negligence appears to be accidental conduct causing "property damage."  Although plaintiffs'
conduct in attempting to repair the water intrusion issues was intentional, "an[] aspect in the causal
series of events leading to the injury or damage" could have been a matter of fortuity.  See
Merced, 213 Cal.App.3d at 50.  Finally, such negligence would not fall under the "owner/occupant"
exclusion to the Policy, (see Dkt. 30-3, JEA, Exh. 1 at JA1_015), as the harm continued after
plaintiffs sold the property.  (See id., Exh. 2, at JA2_006); Montrose, 10 Cal.4th at 686 ("[A]n
insurer on the risk when continuous or progressively deteriorating damage or injury first manifests
itself remains obligated to indemnify the insured for the entirety of the ensuing damage or injury.").

In short, "insurers have a heavy burden when seeking summary judgment on the duty to
defend[;]" they "must defend its insured so long as the complaint at issue [or extrinsic evidence]
raises the possibility that the insured will be liable for losses covered by its policy." Anthem, 302
F.3d at 1056; Montrose, 6 Cal.4th at 300 (an insurer is relieved of its duty to defend only where
"no conceivable theory [can] raise a single issue which could bring it within the policy coverage")
(internal quotation marks omitted).  Here, Kemper has failed to carry this burden of proving that
no such possibility ever existed, and plaintiffs have demonstrated the existence of this possibility,
and thus Kemper's duty to defend them. See Buss, 16 Cal.4th at 58 ("[An insurer] has a duty to
defend the 'mixed' action in its entirety, i.e., as to both the claims that are at least potentially
covered and also those that are not.")

III.    DUTY TO INDEMNIFY

"Although an insurer may have a duty to defend, it ultimately may have no obligation to
indemnify, either because no damages were awarded in the underlying action against the insured,
or because the actual judgment was for damages not covered under the policy." Montrose, 10
Cal.4th at 659, n. 9.  "Where there is a duty to defend, there may be a duty to indemnify; but where
there is no duty to defend, there cannot be a duty to indemnify." Certain Underwriters, 24 Cal.4th
at 958 (emphasis omitted). The duty to indemnify "arises only when the insured's underlying

1   liability is established[.]"  Pardee Const. Co. v. Insurance Co. of the West, 77 Cal.App.4th 1340,

2   1350 (2000); see also Collin v. American Empire Ins. Co., 21 Cal.App.4th 787, 803 (1994) (an

3   insurer has a "duty to indemnify only where a judgment has been entered on a theory which is

4   actually (not potentially) covered by the policy").

5        Here, only resolution of the duty to defend issue is appropriate at this stage of the

6   proceedings.  As to whether Kemper has a duty to indemnify plaintiffs, the "better course would

7   be to proceed to full trial[,]" Anderson, 477 U.S. at 255, 106 S.Ct. at 2513; see Collin, 21

8   Cal.App.4th at 1350 ("The duty to indemnify involves the payment of money to resolve liability, and

9   therefore, it arises only after liability is established.").

10                                      **CONCLUSION**

11       Based on the foregoing, IT IS ORDERED THAT:

12       1.   The parties' Motion **(Document No. 30)** is **granted in part** and **denied in part**.

13  Kemper's Motion for Summary Judgment is **denied**.  Plaintiffs' Motion for Summary Judgment as

14  to whether Kemper has a duty to defend is **granted**.  Plaintiffs' Motion for Summary Judgment is

15  denied in all other respects.

16       2.   Since the court will not be conducting any jury trials anytime in the near future, see In

17  Re: Coronavirus Public Emergency, Amended General Order No. 20-09 (C.D. Cal. August 6,

18  2020), at 2, the court will reopen discovery for the limited purpose of allowing the parties to

19  conduct discovery relating to plaintiffs' request for Brandt fees.  All discovery relating to Brandt

20  fees shall be completed no later than **November 30, 2020**.

21       3. Defendant's motions in limine **(Document No. 48)** are **denied without prejudice**.  After

22  the court is able to conduct civil jury trials, the court will set new pretrial deadlines and require the

23  submission of updated pretrial papers.  In the meantime, the parties are strongly encouraged to

24  participate in further settlement negotiations.

25  Dated this 18th day of September, 2020.

26                                              /s/
                                   _____
27                                      Fernando M. Olguin
                                      United States District Judge

28

                                           15